## NORFOLK SOUTHERN CORPORATION AND AFFILIATED COMPANIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 19305–91, 19306–91.      Filed January 11, 1995.

---

*Newman T. Halvorson, Jr., Sean F. Foley, Frederick A. Richman, Andrew J. Frackman, Joseph G. Giannola, Richard Alan Brady,* and *William M. Paul,* for petitioners.

*Phillip A. Pillar, John A. Guarnieri, Stephen M. Miller,* and *Keith L. Gorman,* for respondent.

PARR, *Judge:* Respondent determined the following deficiencies in petitioners' Federal corporate income taxes, net of offsets for credits or refunds of overassessments of taxes to which respondent agrees petitioners are entitled:[1]

| Year | Net deficiency |
|---|---|
| 1981 | $8,274,876 |
| 1982 | 5,859,265 |
| 1983 | 6,319,433 |
| 1984 | 736,022 |
| 1985 | 6,788,350 |
| Total | 27,977,946 |

[1] Respondent agrees that, except for the issue of whether petitioners are entitled to investment tax credits, accelerated depreciation deductions, and various other tax incidents relating to the intermodal cargo containers at issue in the instant cases, petitioners are entitled to credits or refunds of overassessments for taxes in the following years and for the following amounts:

| Year | Amount |
|---|---|
| 1981 | $5,426,708 |
| 1982 | 3,141,956 |
| 1983 | 464,815 |
| 1984 | 6,666,730 |
| Total | 15,700,209 |

These cases were consolidated for trial, briefing, and opinion. The ultimate issue for decision is whether petitioners may claim investment tax credit (ITC) and accelerated depreciation deductions for certain intermodal cargo containers[2] (containers) subject to a safe harbor lease entered into between petitioners and Flexi-Van, Inc. (Flexi-Van), on November 13, 1981. In order to resolve that issue, we must decide, in a case of first impression, the meaning of the phrase "used in the transportation of property", and more specifically the meaning of the word "used", as employed in section 48(a)(2)(B)(v). All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. We must decide also the extent of contact with the United States, if any, a container must have in order to satisfy the container exception. Additionally, we must decide whether petitioners have shown that Flexi-Van's containers met the container exception. For that purpose, we consider expert testimony submitted by the parties in support of their respective positions. Last, we decide whether it is nonetheless inequitable to require petitioners to establish for the years in issue that the containers satisfied the container exception. We hold that petitioners may claim ITC and accelerated depreciation for the containers to the extent set forth herein.

FINDINGS OF FACT

The parties submitted these cases partially stipulated. The stipulation of facts, supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference.

Petitioner Norfolk Southern Corp. is a corporation incorporated in the Commonwealth of Virginia. Its principal place of business at the time of the filing of the petitions was Norfolk, Virginia. For the year 1981 petitioner Norfolk and Western Railway Co. and for the years 1982 through 1985 petitioner Norfolk Southern Corp. was the common parent of an

---

[2] An intermodal cargo container (container) is a reusable box utilized to transport goods. It generally is made of metal and equipped with doors for easy access to the goods carried inside. The container is designed to facilitate the handling and loading, stowage, and carriage aboard ship, train, and truck, and the unloading, handling, and delivery of, large numbers of packages of goods shipped within the container. "Intermodal" refers to the ability of the container to be moved among vessels, trucks, and railroads on the way to an ultimate destination, without any intermediate loading or unloading of the contents of the container.

affiliated group of corporations which filed consolidated Federal income tax returns. Norfolk and Western Railway Co. was one of those affiliated corporations for 1982 through 1985. Hereinafter, Norfolk will be used to refer to Norfolk and Western Railway Co. or Norfolk Southern Corp., as applicable. Under the safe harbor lease petitioners stand in the shoes of Flexi-Van with regard to ITC and accelerated depreciation during the years in issue.

*Background*

Flexi-Van is a Delaware corporation which was engaged in the business of leasing containers and chassis[3] to shipping companies engaged in the transportation of property in international trade routes during 1981 through 1985. During 1981, Flexi-Van's world headquarters was located in New York, New York.

Flexi-Van has been engaged since the early sixties in the business of providing containers for lease from locations in the United States and around the world. During 1981, Flexi-Van was the second largest container leasing company in the world, owning about 245,000 TEU's[4] of containers, and was one of seven companies that dominated the container leasing industry.[5]

Intermodal cargo containers are manufactured in standardized dimensions, with standardized performance characteristics pursuant to international agreements to which the United States is a party. The containers are generally used on vessels specifically constructed or modified for the purpose of transporting such containers. Standardization of the construction characteristics of containers has been developed primarily through the International Organization for Standardization, an international body of standards associations from approximately 55 nations. A container may be certified as meeting international standards by any duly recognized certifying body, including foreign certifying bodies provided for in the international agreements governing

---

[3] Chassis are specially designed flatbed trailers on which containers can be placed for transportation over the road and by rail.

[4] Intermodal cargo containers commonly are referred to in terms of 20-foot equivalent units or TEU's. A 20-foot container is one TEU; a 40-foot container is two TEU's.

[5] In addition, during 1981, Flexi-Van was the world's largest lessor of chassis. Its chassis were concentrated in the United States. Flexi-Van offered chassis for lease from 40 offices and depots both in ports and inland cities in the United States.

containers to which the United States is a party. In the United States, the U.S. Coast Guard establishes standards for certification of containers. As a result of the standardization of the size and construction characteristics of containers under international standards, certified containers of the same type, size, and construction are in essence interchangeable assets.

The standard container is called a dry van. There are also specialized containers, such as refrigeration containers (reefers), open-top containers, flat rack containers, and tank containers. Containers have standard dimensions in length (20 or 40 feet), width (8 or 9 feet), and height (usually 8 or 8.5 feet although the height can also be 9.5 feet). A non-standard container can have a length of 24, 27, 30, or 35 feet. Of all the containers owned by U.S. carriers and lessors in 1981, more than 90 percent were dry van containers, according to the U.S. Department of Transportation, Maritime Administration.

Intermodal cargo containers used in commerce are not permanently stationed at any location. They move in commerce on board ships and railroad cars at the discretion of the persons shipping property in international commerce. The extent to which containers are used and the routes on which they are used depend on the needs of the persons shipping the property.

A container may travel a water route, inland, or both. After the consignee has unloaded the goods, the container may be either reloaded at or near the place of unloading, returned to the shipping line's local storage facility to await further use, or moved to another location where demand may be greater. If a container has been damaged, it also may be put into repair. For the containerized shipment of cargo to be efficient, large numbers of containers have to be readily available, and those containers must be spread throughout the world in depots on international trade routes. Often, containers are transported empty from a location where there is a surplus of containers to another location where there is a shortage (repositioning).

According to statistics published in Containerisation International,[6] during the period 1978 through 1985, container port handlings (in million TEU's) for the United States (the largest country for port handlings during that period), Japan (the next largest country), and the world (including the United States and Japan) were as follows:

| Year | United States | Japan | World |
|------|---------------|-------|-------|
| 1978 | 5.94 | 2.46 | not provided |
| 1979 | 7.24 | 2.90 | 31.99 |
| 1980 | 8.57 | 3.42 | 37.16 |
| 1981 | 8.36 | 3.74 | 40.85 |
| 1982 | 8.73 | 3.75 | 42.84 |
| 1983 | 9.56 | 4.11 | 45.57 |
| 1984 | 10.90 | 5.03 | 53.32 |
| 1985 | 11.53 | 5.51 | 55.90 |

As of 1981, containers were owned predominantly by leasing companies, and the trend was toward increasing leasing company ownership. A container leasing company provides operating flexibility to ocean carriers by allowing them to pick up and drop off containers in various ports around the world.

During the period 1981 through 1985, the container leasing business was very competitive. Competition in the leasing business was based primarily on leasing rates and service. Service was largely a function of the number of units of equipment and the condition of the equipment available for lease together with the ability to provide flexible pickup and dropoff locations throughout the world. Service also took into account the ability of the lessor to provide containers on demand at pickup and dropoff locations throughout the world. The more locations a lessor had, the more attractive the lessor's service, depending on the needs of the lessees.

*Flexi-Van's Containers*

During 1981, Flexi-Van's containers were available from over 230 locations in more than 80 countries and on all six populated continents. Flexi-Van placed special emphasis on worldwide leasing of containers and related equipment.

---

[6] Containerisation International is a monthly trade journal which publishes computations of worldwide container handlings by port and by country. The port handling compilations are derived in part from port handling records maintained by harbor masters throughout the world. Yearly computations are compiled in the Containerisation International Yearbook.

Approximately 68 to 70 percent of its customers were foreign based. Flexi-Van's equipment pools covered virtually every world trade route. It maintained 40 locations in principal commercial centers in the United States. By the end of 1982, Flexi-Van held approximately a 10-percent share of the world container leasing market.

All of Flexi-Van's containers are suitable for use on voyages to or from the United States as well as on rail, truck, and barge transportation in the United States and other countries. Its containers are designed to comply with, and are certified as complying with, international standards for size, construction, safety, and markings in accordance with international agreements to which the United States is a party. Flexi-Van's containers also meet the safety standards and specifications set out by the Association of American Railroads for containers carried on U.S. railroads and on the highways. All or substantially all of the containers are listed in the Intermodal Equipment Register.[7]

Flexi-Van leases containers under various types of agreements, including leases of 3 years or more, which generally return a substantial portion of the cost of the equipment and related expenses over the term of the lease; leases of less than 3 years, which command higher rates but do not return the full cost of the equipment during the term of the agreement; per diem leases, which command the highest rates; and master lease agreements, under which the lessee guarantees to hire a minimum number of units and in return has the right to pick up and drop off units at designated ports around the world.

Flexi-Van's leases do not specify where or on what trade route its leased equipment may be used. The leases do not require the lessee to use the containers in the transportation of property to or from the United States. In the ordinary course of its business, Flexi-Van does not ask its lessees to disclose the location or movement of specific containers while those containers are on lease. Under the lease agreements, however, the lessee agrees to report the location of the equipment if Flexi-Van asks for that information. That lease provi-

---

[7] The function of the Intermodal Equipment Register, which is published for U.S. railroads by the Intermodal Publishing Co., Ltd., is to facilitate the interchange of containers by U.S. railroads, and it is published pursuant to the tariff authority of the Interstate Commerce Commission and the Federal Maritime Commission of the United States.

sion is intended to enable Flexi-Van to locate its containers should the need arise, such as in the event of a bankruptcy or default of the lessee.

Flexi-Van tracks its equipment primarily through a document called an equipment interchange receipt (EIR). An "on-hire" EIR is executed whenever a lessee takes custody of equipment under a lease. An "off-hire" EIR is executed when the lessee returns the equipment. The EIR identifies the lessee, the lease number, the equipment, the location of the on-hire or off-hire, and the date of the on-hire or off-hire. From these EIR's Flexi-Van can associate the identity of the lessee and the location where the equipment has been picked up and dropped off.

Flexi-Van maintains reports which show when a container is purchased, its price, the manufacturer, the place of delivery, the lessee, and the date and place where that container has been picked up or dropped off at the commencement or conclusion of a lease and the date the container is added to or deleted from the fixed asset ledger. Other than on-hire and off-hire locations at the commencement or termination of a lease, Flexi-Van's records do not provide information on the movement or use of containers while on lease.

Flexi-Van claimed ITC pursuant to section 38 for all containers added to its fixed asset ledger each year in the applicable Federal corporate income tax return for each of the years 1966 through 1980, except for any year in which the ITC was not in effect. In each return, Flexi-Van reported recapture of the ITC pursuant to section 47 with respect to the containers that were sold, scrapped, lost, or otherwise disposed of during that year, if such disposal occurred before the close of the useful life that was taken into account in computing the ITC (recapture period). Flexi-Van did not report recapture of ITC or accelerated depreciation for containers which had no lease activity for a period extending over an entire taxable year.

*The Safe Harbor Lease Arrangement*

On November 13, 1981, Norfolk entered into an agreement (agreement) with Flexi-Van Leasing, Inc. Norfolk and Flexi-Van intended the agreement to be a safe harbor lease under

section 168(f)(8).[8] In substance, under the agreement Norfolk agreed to pay Flexi-Van $18,032,147 for all rights to claim ITC and accelerated depreciation deductions relating to certain equipment covered by the agreement. There was no transfer of title or possession of the equipment from Flexi-Van to Norfolk at any time. Under the agreement, Flexi-Van agreed to indemnify Norfolk in the event that the ITC or accelerated depreciation deductions were not allowed by respondent.

The equipment covered under the agreement consisted of certain containers as well as chassis, trailers, and other property specifically listed in an attachment to the agreement.[9] Norfolk and Flexi-Van intended the agreement to include all containers placed in service [10] by Flexi-Van from January 1 through November 13, 1981, with the exception of (1) any such containers later sold, retired, or otherwise disposed of during 1981, and (2) containers identified to be on lease for

---

[8] The safe harbor leasing provisions were enacted in 1981 as part of the Economic Recovery Tax Act of 1981, Pub. L. 97–34, 95 Stat. 172. Those provisions were intended, under certain circumstances, to permit owners of property who could not use the tax benefits of ownership (e.g., accelerated depreciation and investment tax credit) to transfer some of those benefits to other persons who could use them, without having to meet prior law requirements for characterizing the transaction as a lease. See, e.g., S. Rept. 97–144 (1981), 1981–2 C.B. 412, 432. Sec. 168(f)(8) was the operative provision for safe harbor leasing activity. As in effect for 1981, that section provides in pertinent part:

(8) SPECIAL RULE FOR LEASES.—
  (A) IN GENERAL.—In the case of an agreement with respect to qualified leased property, if all of the parties to the agreement characterize such agreement as a lease and elect to have the provisions of this paragraph apply with respect to such agreement, and if the requirements of subparagraph (B) are met, then, for purposes of this subtitle—
    (i) such agreement shall be treated as a lease entered into by the parties (and any party which is a corporation described in subparagraph (B)(i)(I) shall be deemed to have entered into the lease in the course of carrying on a trade or business), and
    (ii) the lessor shall be treated as the owner of the property and the lessee shall be treated as the lessee of the property.
  (B) CERTAIN REQUIREMENTS MUST BE MET.—* * *

The safe harbor leasing provisions were repealed by sec. 209 of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97–248, 96 Stat. 324, 442.

[9] Respondent allowed the ITC and accelerated depreciation deductions Norfolk claimed on the chassis, trailers, and certain other equipment specified in the agreement, which in total comprised about 6.63 percent of the property covered under the agreement. Consequently, the chassis, trailers, and other such equipment are not in issue in the instant case.

[10] Flexi-Van uses its fixed asset ledger to determine the year in which a container is placed in service. Flexi-Van adds a container to the fixed asset ledger after Flexi-Van receives (1) an invoice for the container and approves it for payment, (2) a certificate from the American Bureau of Shipping or other certifying agency confirming that the container meets the required specifications for transportation of property in international commerce, and (3) a document confirming that the container has in fact been received or made available. With respect to approximately 4,000 of the containers in issue, Flexi-Van's records reflect lease activity before Jan. 1, 1981.

periods of 1 year or longer to shipping companies with no U.S. trade routes as of the date of the agreement. After such deletions, the agreement covered 38,037 containers with a total cost of approximately \$112,238,384, consisting of approximately 27,000 20-foot containers with an average cost of approximately \$2,400, approximately 10,500 40-foot containers with an average cost of approximately \$3,700, and approximately 400 reefers with an average cost of approximately \$22,500.

All of the containers were of foreign manufacture and were delivered to Flexi-Van in various countries. Approximately 15 percent were delivered to Flexi-Van in the United States. Approximately 98 percent of the containers are standard steel dry van containers.

During the period 1981 through 1985, Flexi-Van leased the containers to more than 675 shipping companies based throughout the world. During those years, many shipping companies had routes which were connected by either a hub or a triangle. A few shipping companies operated round-the-world services.

For each of the years 1982 through 1985, Flexi-Van reported semiannually to Norfolk the identity and cost of containers that had been lost, stolen, sold, or scrapped during each year so that Norfolk could report recapture of ITC and accelerated depreciation for those containers on the applicable tax return. For purposes of recapture, Flexi-Van did not specifically report to Norfolk the identity of containers that were not on-hire for a period which extended for an entire taxable year.

*Audit of Norfolk and Flexi-Van Relating to the Containers*

Pursuant to the agreement, Norfolk claimed ITC of \$12,346,851 and accelerated depreciation of \$16,835,758, as well as other tax incidents, relating to the containers in its consolidated Federal income tax return for the year ended December 31, 1981 (1981 return), and accelerated depreciation of \$24,616,506, \$23,395,907, \$23,253,998, and \$23,110,032, as well as other tax incidents, relating to the containers in its consolidated Federal income tax returns for the years ended December 31, 1982, 1983, 1984, and 1985, respectively. Included in Norfolk's 1981 Federal income tax

return was a Form 6793, Safe Harbor Lease Information Return, relating to the containers.

Norfolk's 1981 Federal income tax return was audited during 1983 and 1984 by a team of revenue agents headed by Revenue Agent Bernie Justice (Agent Justice) (first audit). The first audit was closed without the assertion of an adjustment relating to the containers. In August 1985, respondent reopened the audit of Norfolk's 1981 return for the purpose of examining further the ITC and other tax benefits Norfolk had claimed in that return relating to the containers (second audit). The second audit followed a telephone conversation that Agent Justice had in February 1985 with Revenue Agent Bernard Cohen (Agent Cohen) concerning Agent Cohen's audit of Flexi-Van relating to the containers.[11]

Agent Cohen had contacted Flexi-Van originally in January 1985 to indicate that he was pursuing an industrywide study of ITC relating to containers and to request a copy of Flexi-Van's Federal corporate income tax returns for the years ended 1981 and 1982. In February 1985, Flexi-Van sent letters to its 100 largest lessees of containers to confirm the movement of those containers. In March 1985, Agent Cohen informed Flexi-Van that the audit of Flexi-Van's Federal corporate income tax return for the year ended December 31, 1981, would be restricted to the question of whether the containers were used in the transportation of property to or from the United States. Agent Cohen also advised Flexi-Van that it would need to establish that the containers qualified for ITC for that year through books and records showing the movements of the containers during the recapture period. Thomas Russo (Russo), Flexi-Van's director of taxes, indicated that Flexi-Van's records basically merely indicated when and where a container was on-hired or off-hired and the name of the customer to whom the container was leased.

---

[11] In addition, Agent Justice met with Agent Cohen in New York, New York, before commencing the second audit to discuss Agent Cohen's audit of Flexi-Van's Federal corporate income tax return for the year ended Dec. 31, 1981, and to obtain further information relating to the containers. Agent Cohen also had audited another unrelated container lessor before the audit of Flexi-Van relating to the containers and had proposed a large adjustment to the ITC for containers that the other lessor had claimed on its tax returns for the years ended 1979 and 1980, including ITC carryforwards from the years ended 1975 through 1979. See *infra* pp. 28–29. In addition, Agent Cohen was the author of a memorandum dated Apr. 6, 1984, sent under the name of the Chief, Examination Division of the Manhattan District, to the Assistant Regional Commissioner identifying a potential ITC issue relating to containers. See *infra* p. 29.

During the audit, Russo provided to Agent Cohen information relating to movements for 3,083, out of a sample of 5,000, of the containers (sampled containers) leased on short-term leases, such as information from the EIR's of the sampled containers, data from Containerisation International regarding the route structures of the lessees of the sampled containers, and letters from some of those lessees confirming the general utilization of the sampled containers. Other than the on-hire and off-hire information for the sampled containers, Flexi-Van did not provide information which tracked the movements of the containers during the applicable recapture period.

Sometime later, Agent Justice, in connection with his audit of Norfolk's consolidated Federal income tax return for 1981, requested information from Flexi-Van that would detail the activities of all of the containers. Russo provided information showing the on-hire and off-hire locations and dates and the names of the lessees for those containers. Russo did not trace the actual movement of the containers during 1981. Subsequently, Flexi-Van and Norfolk each received revenue agent reports which concluded that they had not shown that the containers qualified as eligible property for purposes of ITC and accelerated depreciation.

In the notices of deficiency issued to petitioners for the years in issue, respondent determined that petitioners were not entitled to ITC, accelerated depreciation, and other tax incidents relating to the containers for the years in issue on the ground that the agreement did not qualify under the safe harbor lease provisions of section 168(f)(8), because petitioners did not establish that the containers qualified as eligible property for 1981.

## Tracing Movements of Containers

Tracing the movements of the individual containers during the period 1981 through 1985 usually would have been impracticable because (1) it would have been disproportionately expensive when compared to the value of the tax benefits permitted under section 38[12] or 168(a), (2) it would have

---

[12] For 1981, the ITC with respect to a container was equal to 10 percent of the cost of the container. This amount ranged approximately from $240 to $370 for the standard dry van containers involved in the instant case.

been disproportionately difficult given the numerous worldwide trade routes with multiple termini, and (3) it would have involved the participation of persons other than Flexi-Van, since the containers were under the physical control of shipping company lessees and their customers.

At the suggestion of its accounting firm for purposes of confirming the ITC claimed for its container fleet during 1972, 1974, and 1977, Flexi-Van sent letters (confirms) asking its lessees about the movement of Flexi-Van's containers during their leases to those lessees. The confirms asked the lessees, among other things, whether the leased containers were used only in transportation to and from the United States, entered the United States at least once each year, or never entered the United States.

During the period 1981 through 1985, the five largest U.S. shipping lines did not routinely trace the movement of individual containers for U.S. container lessors, nor did U.S. container lessors routinely request such tracing. During 1981, those shipping lines generally did not have the capability to trace the movement of individual containers on a routine basis.

*Prior Audits of Flexi-Van*

The Commissioner audited the Federal corporate income tax returns filed by Flexi-Van for 1966, 1968 through 1973, 1975, and 1976. For those years, the Commissioner did not require Flexi-Van to establish that each container was actually used substantially in the direct transportation of property to or from the United States in order for that container to qualify for ITC or accelerated depreciation deductions.

*Development of Respondent's Interpretation of the Container Exception*

*Technical Case Study*

During 1980, the Commissioner initiated a technical case study to develop a position with regard to the meaning of the phrase "used * * * to and from the United States" as it relates to section 48(a)(2)(B)(v).[13] The technical case study

---

[13] Under sec. 48(a)(2)(A), generally property is not eligible for ITC if it is used predominantly

was closed and subsequently reopened as a revenue ruling project (RR project). A draft revenue ruling was prepared in 1981. The Institute of International Container Lessors (IICL), a trade association, was notified of the RR project during October 1981. Representatives of the IICL met with representatives of the Internal Revenue Service (IRS) in January 1982 to provide information about the container leasing industry. In May 1982, the IICL submitted to the IRS a memorandum entitled "Containers and the Investment Tax Credit". The RR project was closed in 1982 without the publication of a revenue ruling.

### Issuance of Revenue Ruling, Revenue Procedure, and Technical Advice Memorandum

Reliance Group Holdings, Inc. (Reliance),[14] through its wholly owned subsidiary CTI International, Inc. (CTI),[15] was involved in the leasing of containers for the years 1968 through 1980. CTI claimed ITC on all the containers it placed in service during each year from 1974 through 1979.

In connection with an audit of Reliance's consolidated Federal income tax return for the year ended 1980 (1980 return), the revenue agent assigned to that audit reviewed CTI's entitlement to ITC totaling $36,498,990, utilized by Reliance in its 1980 return as a result of containers placed in service in taxable years 1974 through 1979. The revenue agent proposed to disallow all the ITC with respect to those containers on the grounds that CTI did not maintain records which would specifically identify which containers reached a U.S. port. The audit of Reliance's tax returns for the 1980 year resulted from a memorandum dated April 6, 1984, prepared by Agent Cohen. See *infra* p. 29. CTI was included in the list of corporations referenced in that memorandum.

In response to the revenue agent's proposal to disallow all the ITC relating to its containers, Reliance requested in July 1987 that the IRS Appeals officer assigned to its case seek

---

outside the United States during the taxable year. Under sec. 48(a)(2)(B)(v), however, a container used predominantly outside the United States nonetheless qualifies for ITC if it is owned by a U.S. person and is "used in the transportation of property to and from the United States" (sometimes hereinafter referred to as the container exception).

[14] For purposes of these proceedings, Reliance Group Holdings, Inc., has waived its rights under secs. 6103 and 6110 with respect to the disclosure of its 1980 and prior years' tax returns or tax return information relating to its intermodal cargo containers.

[15] CTI was sold to Gelco Corp. (Gelco) during 1980. During 1981, CTI was the largest U.S. container lessor.

technical advice from the IRS National Office in Washington, D.C. (National Office), regarding certain issues of law relating to Reliance's entitlement to ITC for containers claimed in Reliance's 1980 return. The request for technical advice was forwarded to the National Office on or before November 4, 1987.

During the National Office's consideration of that request for technical advice, Reliance and other container lessors, including Flexi-Van, submitted material to the IRS regarding the container leasing business. In addition, the National Office sought information from within the IRS regarding the audit history of containers and their eligibility for ITC.

In response to CTI's request for technical advice and the material submitted by CTI, Flexi-Van, and others, the Commissioner issued Rev. Rul. 90–9, 1990–1 C.B. 46,[16] Rev. Proc. 90–10, 1990–1 C.B. 467,[17] and Tech. Adv. Mem. 90–45–001 (May 3, 1990).

### Audits of Other Container Lessors

Respondent does not know whether any of her revenue agents required any other container lessor to provide evidence that its containers were used substantially in the transportation of property to or from the United States.

### Transamerica Corp.[18]

Transamerica ICS, Inc.,[19] was a competitor of Flexi-Van during the years in issue. During 1981, Transamerica was

---

[16] The Commissioner concluded in Rev. Rul. 90–9, 1990–1 C.B. 46, 47, that to meet the container exception "a cargo container must be used substantially in the direct transportation of property to or from the United States during each taxable year of its recovery period." Pursuant to that revenue ruling, direct transportation for purposes of the container exception "consists of the transportation of property by the container with the United States as the origin or terminus of the trip for the container and the property." *Id.*

[17] Rev. Proc. 90–10, 1990–1 C.B. 467, issued on the same day as Rev. Rul. 90–9, 1990–1 C.B. 46, set out a relief mechanism by which a taxpayer could use a table provided in the revenue procedure in lieu of the records required in Rev. Rul. 90–9 to document that a container was eligible for ITC or accelerated depreciation under the container exception.

[18] Transamerica Corp. has waived its rights under sec. 6103 with respect to the disclosure of the following tax return information.

[19] Transamerica Corp. acquired Interway Container Service, Inc. (Interway), in July 1979 and apparently changed the latter company's name to Transamerica Interway (a holding company) or Transamerica ICS, Inc. (a direct subsidiary of Transamerica Interway). Transamerica ICS, Inc., whose business was to lease intermodal cargo containers, was merged into Transamerica Interway in 1991. At some point Transamerica Interway became known as Transamerica Leasing, Inc. Upon its acquisition, Interway became a member of a group of affiliated corporations

the third largest lessor of containers. Transamerica offered long-term leases, short-term leases, per diem leases, and master lease agreements to its customers.

Sometime before July 1979, an IRS agent audited Transamerica's Federal corporate income tax returns for the years ended 1972 through 1974. For those years, the Commissioner disallowed ITC claimed on a portion of the containers Transamerica had placed in service during those years pursuant to a formula related to the time of year when such containers were placed in service. No ITC was allowed for containers placed in service late in the year on the ground that it was unlikely that those containers had carried property to the United States before the close of the tax year.

During 1982 and 1983, Agent Cohen along with other IRS agents audited Transamerica's Federal corporate income tax returns for the years ended 1979 and 1980. As part of that audit Agent Cohen examined ITC carryforwards Transamerica claimed from the tax years ended 1975 through July 1979. As a result of that audit, the Commissioner disallowed a portion of the ITC Transamerica had claimed with respect to containers placed in service in each of the years ended 1975 through 1980. The portion of the ITC disallowed was determined using a methodology based on Transamerica'a internal records and information published in the Containerisation International Yearbook relating to the ratio of containers handled in U.S. ports to the containers handled on a worldwide basis.[20] In arriving at the allowable ITC for

---

filing Federal consolidated income tax returns under the name of Transamerica Corp. and Includible Subsidiaries. Subsequent to the acquisition of Interway, containers were obtained also by Transamerica Equipment Leasing Co., Inc., a subsidiary of Transamerica Corp. Transamerica Equipment Leasing Co., Inc., leased those containers to Transamerica ICS, which used them in its business. For simplicity, hereinafter, the name Transamerica will be used to refer to any or all of the above companies, as applicable.

[20] Under that methodology, the containers were categorized on an annual basis into three groups. For containers on long-term leases to companies that did not have U.S. trade routes, no ITC was allowed. For containers on long-term leases to companies that had U.S. trade routes, a formula was applied derived generally from (1) the theory that for each trip over a 2-year period starting with the year the containers were placed in service a declining balance of containers had approximately a one-third opportunity of carrying property to and from the United States, and (2) an estimate of the number of trips that a container could make to and from the United States in 1 year determined from internally generated information showing pickups and dropoffs of Transamerica's containers on short-term leases. No ITC was allowed for containers which were not deemed under the formula to have touched the United States at least once during the 2-year period. For containers on short-term leases, the formula was basically the same as above, except that the declining pool of containers to which the formula was applied was not one-third but rather the percentage of U.S. handling of containers as reflected in the Containerisation International Yearbook. Transamerica would not disclose the estimated num-

containers placed in service during the years ended 1975 through 1980, Agent Cohen did not require Transamerica to trace the actual routes that the containers traveled during those years.

Following the audit of Transamerica's returns for the years ended 1979 and 1980, Agent Cohen prepared a memorandum dated April 6, 1984, under the name of the Chief, Examination Division of the Manhattan District of the IRS to the Assistant Regional Commissioner (the April 6 memorandum). The April 6 memorandum states in pertinent part as follows:

In conjunction with a support audit examination we developed a significant issue relative to the investment tax credits.

Taxpayer, a large corporation, leases containers to the shipping industry. Taxpayer deducted large amounts for the investment tax credit on its return. The investment tax credits do not flow through to the lessees, but are claimed by taxpayer.

These containers are purchased overseas by the taxpayer and picked up by the lessees in the country of manufacture.

In order to be eligible for the investment tax credit, the containers must reach a United States port in accordance with Sections 46 and 48 of the Internal Revenue Code and the related regulations and revenue rulings.

Taxpayer stated that the containers are fungible goods and could not specifically identify which containers reached a United States port. The audit resulted in a large agreed adjustment to the investment tax credit.

The taxpayer stated that the industry uses the same method for deducting the investment tax credit. Enclosed is a list of corporations in the container leasing business. An examination of these entities should result in large I.T.C. adjustments.

Copies of the April 6 memorandum were sent to other IRS regional offices in the United States.

During 1981, Transamerica entered into safe harbor lease arrangements with respect to containers placed in service in 1981 that Transamerica calculated would qualify for ITC based on the methodology used for the prior audit to determine the allowable ITC for the years ended 1975 through 1980. Transamerica did not include in any safe harbor lease, nor did it claim ITC, for the remaining containers it placed in service during 1981.

During 1983 and 1984, Agent Cohen along with other IRS agents audited Transamerica's Federal corporate income tax

---

ber of trips per year for the containers used in the above formula except to admit that the number was more than one.

returns for the years ended 1981 and 1982. During that audit Agent Cohen again used the methodology employed to determine the allowable ITC for the years ended 1975 through 1980 to determine the portion of the containers placed in service during 1981 and 1982 that would qualify for ITC. In addition, the IRS separately applied that same methodology in the audit of the tax return for the year ended 1981 of one of the parties with whom Transamerica had entered into a safe harbor lease to determine the allowable ITC claimed by that party relating to the containers covered under that safe harbor lease arrangement.

During 1986 through 1988, Agent Cohen and another IRS agent audited Transamerica for the years ended 1983 and 1984. At the beginning of that audit, Agent Cohen informed John Mohr, Transamerica's vice president for taxes, that Agent Cohen had been advised by his superiors to disallow ITC on any container that Transamerica could not show by specific records had been used to ship property to and from the United States, because Flexi-Van had declined to follow the settlement formula used by the IRS and Transamerica to determine the allowable ITC for the years ended 1975 through 1980. Transamerica could not produce such records. As a result, the Commissioner disallowed all of the ITC relating to containers Transamerica had placed in service during 1983 and 1984. The Commissioner also disallowed all of the ITC relating to containers placed in service during 1985 and 1986.

Transamerica filed petitions in this Court for redeterminations of the Commissioner's determinations of tax deficiencies for the years 1975 through 1980 and 1986 through 1988.[21] During the pendency of those cases, the IRS promulgated Rev. Rul. 90–9, 1990–1 C.B. 46, and Rev. Proc. 90–10, 1990–1 C.B. 467. In response to the promulgation of Rev. Rul. 90–9, Transamerica developed information specific to its own containers and applicable to its entire fleet for the years 1975 through 1986 by statistical methodology. Thereafter, following negotiations, Transamerica and the IRS agreed to settle the ITC issue relating to those containers generally under the following terms:

---

[21] Docket Nos. 16460–79, 5909–82, 29985–83, 27468–90, 28686–91, and 20010–92.

(1) For containers placed in service during the years ended 1975 through 1982, allowable ITC would be determined under the terms of the agreements previously reached between Transamerica and the IRS.

(2) For containers placed in service during the years ended 1983 through 1986, allowable ITC would be determined essentially under the provisions contained in Rev. Rul. 90–9.

## XTRA, Inc.[22]

During 1981, XTRA, Inc. (XTRA), was the seventh largest container lessor in the world. XTRA competed with Flexi-Van during the years in issue.

XTRA generally claimed ITC and accelerated depreciation on all containers it placed in service. It generally claimed recapture of ITC only for those containers that were lost, sold, or destroyed within the recapture period.

The IRS audited XTRA for 1970, 1974, 1975, and 1976. No adjustments were made as a result of those audits to the ITC or accelerated depreciation that XTRA had claimed relating to the containers.

On November 13, 1981, XTRA entered into a safe harbor lease agreement with Thermo Electron Corp. (Thermo Electron) under which XTRA sold all of the Federal tax benefits relating to certain equipment, including containers. During 1983, the IRS audited Thermo Electron for the fiscal years ended June 30, 1979, June 30, 1980, June 30, 1981, December 31, 1981, and December 31, 1982. During that audit, a revenue agent assigned to the audit asked Thermo Electron to substantiate, among other things, that the containers included in that safe harbor lease agreement were used in the transportation of property to and from the United States. In a letter dated December 29, 1983, from the assistant corporate controller of XTRA forwarding data to Thermo Electron relating to that substantiation request, XTRA represented, among other things, that

The question of whether our containers are used in the transportation of property to and from the United States has arisen before in connection with the regular audit of our tax return by the IRS. In order to respond

[22]XTRA, Inc., and Thermo Electron Corp. have waived their rights under secs. 6103 and 6110 with respect to any disclosure of their tax returns or tax return information for 1982 and prior years relating to intermodal cargo containers.

to this question in the past we have sent letters to our customers asking them to confirm that the XTRA units on lease to them were used in the above described manner. We have historically had difficulty getting responses from the lessees and the process is a time consuming effort. Despite this situation, and the length of time involved in getting responses, we have been able to satisfy the IRS on this issue in the past.

XTRA's assistant corporate controller also represented to Thermo Electron that XTRA had selected data relating to a sampling of 574 units, which represented approximately 10 percent, of the containers subject to the safe harbor lease that were still in existence at the time of the sampling. As reported by XTRA, the data reflected that 31 units were in the United States but not leased throughout 1982, 2 units were outside the United States but not leased throughout 1982, and 541 units were on lease to water-carrier customers during that year. XTRA further indicated that 60 percent of those 541 units were leased during 1982 to two companies which had extensive business in the United States and the remaining units of those 541 units were leased to approximately 60 customers. XTRA also provided the names of the water-carrier customers to whom the 541 containers were leased during 1982. Neither Thermo Electron nor XTRA provided further information relating to the movement of the containers covered under the safe harbor lease arrangement between those two companies. The Commissioner did not adjust the ITC Thermo Electron claimed relating to those containers.

## OPINION

For 1981, section 38 provides a credit against tax for qualifying tangible property used in a trade or business or held for the production of income and having a useful life of 3 years or more at the time the property is placed in service, but only if depreciation is allowable with respect to that property (section 38 property). Sec. 48(a)(1)(A).[23] The deter-

---

[23] Sec. 48(a)(1) provides in pertinent part as follows:

SEC. 48. DEFINITIONS; SPECIAL RULES.

   (a) SECTION 38 PROPERTY.—

      (1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—

         (A) tangible personal property * * *

         *      *      *      *      *      *      *

   Such term includes only recovery property (within the meaning of section 168 without regard to any useful life) and any other property with respect to which depreciation (or amortization

mination of whether property qualifies as section 38 property must be made with respect to the year in which the property is placed in service. Sec. 1.46–3(d)(4)(i), Income Tax Regs.; see *World Airways, Inc. v. Commissioner*, 62 T.C. 786, 809 (1974), affd. 564 F.2d 886 (9th Cir. 1977). Even if property qualifies initially for ITC for the year in which it is placed in service, that ITC must be recaptured if the property is later disposed of or otherwise ceases to be eligible for ITC before the end of the recapture period. Sec. 47.

Section 48(a)(2)(A) moreover provides that property does not qualify as section 38 property if during the taxable year it is used predominantly outside the United States.[24] Certain types of property used in commerce between the United States and foreign countries, however, qualify as section 38 property even if used predominantly outside the United States. Sec. 48(a)(2)(B).[25] Thus, for example, under section

---

in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more. * * *

The investment credit was generally repealed for property placed in service after Dec. 31, 1985, by the Tax Reform Act of 1986, Pub. L. 99–514, sec. 211(a), 100 Stat. 2085, 2166.

[24] Sec. 48(a)(2)(A) provides as follows:

(2) PROPERTY USED OUTSIDE THE UNITED STATES.—

(A) IN GENERAL.—Except as provided in subparagraph (B), the term "section 38 property" does not include property which is used predominantly outside the United States.

Under sec. 1.48–1(g)(1)(i), Income Tax Regs., property is considered to be used predominantly outside the United States if that property is located outside the United States during more than 50 percent of the taxable year. Sec. 1.48–1(g)(1)(i), Income Tax Regs., provides as follows:

(g) Property used outside the United States—(1) General Rule. (i) Except as provided in subparagraph (2) of this paragraph, the term "section 38 property" does not include property which is used predominantly outside the United States (as defined in section 7701(a)(9)) during the taxable year. The determination of whether property is used predominantly outside the United States during the taxable year shall be made by comparing the period of time in such year during which the property is physically located outside the United States with the period of time in such year during which the property is physically located within the United States. If the property is physically located outside the United States during more than 50 percent of the taxable year, such property shall be considered used predominantly outside the United States during that year. * * *

[25] Sec. 48(a)(2)(B) provides in pertinent part as follows:

(B) EXCEPTIONS.—Subparagraph (A) shall not apply to—

(i) any aircraft which is registered by the Administrator of the Federal Aviation Agency and which is operated to and from the United States or is operated under contract with the United States;

(ii) rolling stock which is used within and without the United States and which is—

(I) of a domestic railroad corporation providing transportation subject to subchapter I of chapter 105 of title 49, or

(II) of a United States person (other than a corporation described in subclause (I)) but only if the rolling stock is not leased to one or more foreign persons for periods aggregating more than 12 months in any 24-month period;

(iii) any vessel documented under the laws of the United States which is operated in the

48(a)(2)(B)(v), a container used predominantly outside the United States nevertheless qualifies for ITC if it is owned by a U.S. person and is "used in the transportation of property to and from the United States" (the container exception).[26] The regulation explaining the container exception merely repeats the statutory language. Sec. 1.48–1(g)(2)(v), Income Tax Regs.[27]

In Rev. Rul. 90–9, 1990–1 C.B. 46, however, the Commissioner concluded that to meet the container exception "a cargo container must be used substantially in the direct transportation of property to or from the United States during each taxable year of its recovery period." *Id.*, 1990–1 C.B. at 47. Pursuant to that revenue ruling, direct transportation for purposes of the container exception "consists of the transportation of property by the container with the United States as the origin or terminus of the trip for the container and the property." *Id.* The Commissioner did not limit prospectively the applicability of Rev. Rul. 90–9. *Id.*

We first decide, in the context of section 48(a)(2)(B)(v), what Congress intended by the phrase "used in the transportation of property". The parties attempt to support their positions with numerous arguments, the more significant of which will be discussed below.

Petitioners contend that under section 48(a)(2)(B)(v) a container is used in the transportation of property to or from the United States if the container merely is made available for such use, whether or not the container is ever actually used

---

foreign or domestic commerce of the United States;

(iv) any motor vehicle of a United States person (as defined in section 7701(a)(30)) which is operated to and from the United States;

(v) any container of a United States person which is used in the transportation of property to and from the United States;

(vi) any property (other than a vessel or an aircraft) of a United States person which is used for the purpose of exploring for, developing, removing, or transporting resources from the outer Continental Shelf (within the meaning of section 2 of the Outer Continental Shelf Lands Act, as amended and supplemented; (43 U.S.C. 1331));

[26] Similar provisions apply to accelerated depreciation. Under sec. 168(f)(2), a special accelerated depreciation system is applied for property used predominantly outside the United States, but under sec. 168(f)(2)(D) the alternative depreciation system does not apply to property described in sec. 48(a)(2)(B). The alternative depreciation system for property used predominantly outside the United States is now contained in sec. 168(g).

[27] Sec. 1.48–1(g)(2)(v), Income Tax Regs., provides, in pertinent part, as follows:

(2) Exceptions. The provisions of subparagraph (1) of this paragraph do not apply to—

*       *       *       *       *       *       *

(v) Any container of a United States person which is used in the transportation of property to and from the United States;

to transport property to or from the United States. Petitioners anchor their position on the argument that under long-standing case law property does not have to be actually used in a particular trade or business to be eligible for depreciation or ITC but only must be made available for such use. Petitioners argue that under such case law the term "used" does not refer to actual use and, therefore, if Congress had intended to require actual use in section 48(a)(2)(B)(v), it would have employed the word "actually" in conjunction with the word "used" as it did in other sections of the Internal Revenue Code (Code), citing, as examples, sections 971(d)(2) and 464(a) for instances when Congress employed the phrase "actually used", section 162(a)(1) for the phrase "actually rendered", and section 175(b) for the phrase "actually paid". Petitioners argue further that there is no evidence that Congress intended the word "used" to have one meaning in section 167(a)(1) and another in section 48(a)(2)(B)(v). Consequently, petitioners contend, the containers are eligible section 38 property because they were made available for use, should the occasion arise, in the transportation of property to or from the United States when, as part of Flexi-Van's ongoing business, the containers were added to its fleet in 1981 and offered without restriction to shipping companies engaged in international commerce.

Respondent disagrees with petitioners' interpretation of the container exception and asserts that actual use is intended under the container exception. She argues that petitioners have cited no authority which establishes that the word "used" has, or in 1962 had, a fixed meaning in Federal income tax law that did not require some actual use. Respondent contends that the word "used" must be understood in the context of the phrase "in the transportation of property to or from the United States". Respondent asserts that petitioners' interpretation of "used" as "available for use" denies the explicit requirement of the container exception that a container have some nexus with the United States.

Respondent contends further that, had Congress wanted containers and other property to qualify under the container exception without any showing that the property had some minimum contact with the United States, Congress easily could have said so, but it did not. Respondent asserts that

her position on the container exception, as stated in Rev. Rul. 90–9, *supra*, was motivated by the legislative purpose for ITC. Respondent contends that the mere possibility that a container may transport property to or from the United States sometime during the recapture period is insufficient to satisfy the container exception, because the purpose of the ITC is not furthered unless the container actually transports property to or from the United States. We agree in substance with respondent.

We begin our analysis with the presumption that respondent's determination as to petitioners' tax liability is correct, and petitioners have the burden of proving otherwise. Rule 142(a); *Welch v. Helvering,* 290 U.S. 111, 115 (1933); *Dellacroce v. Commissioner,* 83 T.C. 269, 279–280 (1984). Moreover, since deductions and credits are a matter of legislative grace, petitioners bear the burden of proving entitlement to any deduction or credit claimed on their returns. *INDOPCO, Inc. v. Commissioner,* 503 U.S. 79 (1992); *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440 (1934).

In construing a statute courts generally seek the plain and literal meaning of its language. *United States v. Locke,* 471 U.S. 84, 93, 95–96 (1985); *United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 543 (1940). For that purpose, courts generally assume "'that Congress uses common words in their popular meaning, as used in the common speech of men.'" *Commissioner v. Groetzinger,* 480 U.S. 23, 28 (1987) (quoting Frankfurter, "Some Reflection on the Reading of Statutes", 47 Colum. L. Rev. 527, 536 (1947)); see also *Addison v. Holly Hill Fruit Prods., Inc.,* 322 U.S. 607, 618 (1944) ("After all, legislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him.").[28] Moreover, words in a revenue act generally are interpreted in their "'ordinary, everyday senses'". *Commissioner v. Soliman,* 506 U.S. ____, 113 S. Ct. 701, 705–706 (1993) (quoting *Malat v. Riddell,* 383 U.S. 569, 571 (1966) (quoting *Crane v. Commissioner,* 331 U.S. 1, 6 (1947))); see also *Helvering v. Horst,* 311 U.S. 112, 118 (1940)

---

[28] We are sure that the Court, writing today, would use more gender-neutral language in this and the preceding passage.

("Common understanding and experience are the touchstones for the interpretation of the revenue laws.").

Words with a fixed legal or judicially settled meaning, on the other hand, generally must be presumed to have been used in that sense, unless such an interpretation will lead to absurd results. See *United States v. Merriam,* 263 U.S. 179, 187 (1923); *Lenz v. Commissioner,* 101 T.C. 260, 265 (1993). We must rely on the words of the statute as generally understood, for to do otherwise would be to redraft the statute. *United States v. Locke, supra* at 93, 95–96; *Lenz v. Commissioner, supra* at 265 (citing *United States v. American Trucking Associations, Inc., supra* at 542–543).

Our principal objective in interpreting any statute is to determine Congress' intent in using the statutory language being construed. *United States v. American Trucking Associations, Inc., supra* at 542; *Helvering v. Stockholms Enskilda Bank,* 293 U.S. 84, 93–94 (1934); *General Signal Corp. & Subs. v. Commissioner,* 103 T.C. 216, 240 (1994). Moreover, where the statute is ambiguous, we may look to its legislative history and to the reason for its enactment. *United States v. American Trucking Associations, Inc., supra* at 543–544; *U.S. Padding Corp. v. Commissioner,* 88 T.C. 177, 184 (1987), affd. 865 F.2d 750 (6th Cir. 1989). In addition, we may seek out any reliable evidence as to the legislative purpose even where the statute is clear. *United States v. American Trucking Associations, Inc., supra; Centel Communications Co. v. Commissioner,* 92 T.C. 612, 628 (1989), affd. 920 F.2d 1335 (7th Cir. 1990). As the Supreme Court summarized in *Commissioner v. Engle,* 464 U.S. 206, 217 (1984):

Our duty then is "to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested." *NLRB v. Lion Oil Co.,* 352 U.S. 282, 297 (1957) (Frankfurter, J., concurring in part and dissenting in part). The circumstances of the enactment of particular legislation may be particularly relevant to this inquiry, *Watt v. Alaska,* 451 U.S. 259, 266 (1981), * * *

With these general principles in mind, we turn to the question at hand; i.e., in the container exception, what did Congress intend by the phrase "used in the transportation of property to and from the United States"? Petitioners focus on the word "used" for their interpretation of the container

exception. They assert in essence that, when employed in the Code, the word "used" means "available for use should the occasion arise" unless Congress also utilizes the word "actually" in conjunction with the word "used".

The Code does not define the word "used". Petitioners, however, contend that under longstanding case law the word "used" does not refer to actual use. For their position petitioners rely on *P. Dougherty Co. v. Commissioner,* 159 F.2d 269 (4th Cir. 1946), affg. 5 T.C. 791 (1945); *Kittredge v. Commissioner,* 88 F.2d 632 (2d Cir. 1937), affg. 34 B.T.A. 1314 (1936) (order); *Waddell v. Commissioner,* 86 T.C. 848, 897–898 (1986), affd. per curiam 841 F.2d 264 (9th Cir. 1988); *Piggly Wiggly S., Inc. v. Commissioner,* 84 T.C. 739 (1985), affd. on another issue 803 F.2d 1572 (11th Cir. 1986); *Helfand v. Commissioner,* T.C. Memo. 1984–102; *Kent v. Commissioner,* a Memorandum Opinion of this Court dated Dec. 31, 1953; *Yellow Cab Co. v. Driscoll,* 24 F. Supp. 993 (W.D. Pa. 1938). Petitioners argue that Congress was aware of the fixed judicial meaning for the word "used" when it drafted section 48(a)(2)(B)(v), and Congress therefore must have intended the phrase "used in the transportation of property" to mean "available to be used in the transportation of property should the occasion arise".

Respondent counters that some of the cases petitioners rely on to establish their position that the term "used" means merely "available for such use" (e.g., *Kittredge v. Commissioner, supra; P. Dougherty Co. v. Commissioner, supra*) were decided under section 167(a)(1) or its predecessors and are not applicable to cases arising under section 48(a)(2)(B). Respondent also asserts that other cases on which petitioners rely (e.g., *Waddell v. Commissioner, supra; Piggly Wiggly S., Inc. v. Commissioner, supra*) are not applicable to the instant cases, which involve a specific exception to the general provision denying ITC for property used predominantly outside the United States, because those cases arose under section 48(a)(1) and deal with the question of when property was placed in service for purposes of eligibility for depreciation and ITC. We agree with respondent that there is no fixed judicial meaning for the word "used" in the tax arena.

The cases on which petitioners rely for their position do not define the word "used", but rather interpret the phrases "used in a trade or business" or "placed in service". The

phrase "used in a trade or business" has been defined as "equivalent to 'devoted to the trade or business'; that is to say, that property once used in the business remains in such use until it is shown to have been withdrawn from business purposes." *Kittredge v. Commissioner, supra* at 634; see also *P. Dougherty Co. v. Commissioner, supra* at 271 (for purposes of determining whether depreciation was allowable for years when barges lay idle for protracted periods during a 20-year period of time, it was sufficient that they were kept in usable condition and were ready for use should the occasion arise; i.e., they were devoted to the trade or business); *Clairmont v. Commissioner,* 64 T.C. 1130, 1136 (1975) (explaining the so-called idle asset rule which holds that depreciation deductions are available in situations where the asset involved, while not in actual use during the year in issue, was nevertheless devoted to the business of the taxpayer and ready for use should the occasion arise). Similarly, an asset generally is "placed in service" for depreciation purposes when it is in a condition or state of readiness and available for a specifically assigned function. See *Piggly Wiggly S., Inc. v. Commissioner, supra* at 746; sec. 1.167(a)–11(e)(1)(i), Income Tax Regs. Under petitioners' theory, the word "used" has an equivalent meaning in the revenue laws unless modified by the word "actually". We believe that petitioners' position goes too far.

We have found no cases, and petitioners have cited none, where the word "used" was found to have a fixed meaning. We do not agree with petitioners that, because in some sections of the Code Congress employed the phrase "actually used", actual use is never intended unless the word "used" is modified by the word "actually". The word "used" should be given its common and ordinary meaning, unless persuasive evidence or context indicates otherwise. Cf. *Commissioner v. Brown,* 380 U.S. 563, 570–571 (1965) ("A 'sale,' however, is a common event in the non-tax world; and since it is used in the Code without limiting definition and without legislative history indicating a contrary result, its common and ordinary meaning should at least be persuasive of its meaning as used in the Internal Revenue Code."). In common usage, the word "used" means put into action or service; employed. See Webster's Third New International Dictionary

(1981).[29] We conclude that there is no evidence that Congress had in mind a fixed meaning for the word "used", as is advocated by petitioners, in the container exception when Congress enacted section 48(a)(2)(B)(v).[30]

Although we reject petitioners' position that the word "used" has a fixed judicial meaning, the question still remains whether, in utilizing the phrase "used in the transportation of property to and from the United States" in section 48(a)(2)(B)(v), Congress intended to extend ITC and accelerated depreciation benefits to containers that, while not employed to transport property to or from the United States during the taxable year in which they were placed in service, might be used for that purpose sometime in the future. In our view, Congress did not.

The meaning of words in a statute ordinarily is derived from their context. *Deal v. United States,* 508 U.S. ___, 113 S. Ct. 1993, 1996 (1993). Therefore, in interpreting the meaning of section 48(a)(2)(B)(v), we do not focus on one word as petitioners have done, for to do so runs the risk of distorting the statute's true meaning. See *United States Natl. Bank v. Independent Ins. Agents,* 508 U.S. ___, 113 S. Ct. 2173, 2182 (1993); *Richards v. United States,* 369 U.S. 1, 11 (1962); *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 285 (1956). As the Court of Appeals for the Seventh Circuit recently cautioned:

there is no principle of interpretation that if the meaning of a word, phrase, or sentence plucked out of the heart of a statute seems clear if you do not read or think beyond it you must accept this as the meaning of the statute. On the contrary, taking a word, a phrase, or a sentence out of context is as great a sin in statutory interpretation as it is in ordinary argument. "Slicing a statute into phrases while ignoring their contexts—the surrounding words, the setting of the enactment, the function a phrase serves in the statutory structure—is a formula for disaster." *Herrmann v. Cencom Cable Associates, Inc.,* 978 F.2d 978, 982 (7th Cir. 1992). But there is context and there is context. Surrounding sentences are context for

---

[29] In determining the ordinary usage of words, it is appropriate to consult dictionaries. *Rome I, Ltd. v. Commissioner,* 96 T.C. 697, 704 (1991); see also *National Muffler Dealers Association, Inc. v. United States,* 440 U.S. 472, 480 n.10 (1979).

[30] We note in further support of our rejection of petitioners' interpretation of the container exception that in sec. 48(a)(2)(B)(v) Congress employed the phrase "used in the transportation of property", not "used in the trade or business of transporting property". "The use of different phrases may reasonably be viewed as an indication of two different meanings." *Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 128 (1989) (Marshall, J., dissenting); see also *LaCroix v. Commissioner,* 61 T.C. 471 (1974) (phrase "tangible personal property" interpreted for purposes of sec. 179).

interpreting a sentence, but so is the history behind the sentence, where the sentence came from, what problem it was written to solve, who drafted it, who opposed its inclusion in the statute. [*Sundstrand Corp. v. Commissioner,* 17 F.3d 965, 967 (7th Cir. 1994), affg. 98 T.C. 518 (1992); citations omitted.]

Moreover, although identical words in different sections may mean identical things, *Commissioner v. Keystone Consol. Indus., Inc.,* 508 U.S. ___, 113 S. Ct. 2006, 2011–2012 (1993), the way a word is employed in one section of a statute does not necessarily establish its meaning in some other section. See *Dewsnup v. Timm,* 502 U.S. 410, ___, 112 S. Ct. 773, 778 (1992); *District of Columbia v. Carter,* 409 U.S. 418, 421 (1973); *Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 433 (1932); *Calderon v. Witvoet,* 999 F.2d 1101, 1104 (7th Cir. 1993). "It is not unusual for the same word to be used with different meanings in the same act, and there is no rule of statutory construction which precludes the courts from giving to the word the meaning which the legislature intended it should have in each instance." *Atlantic Cleaners & Dyers, Inc. v. United States, supra* at 433; see also *Helvering v. Stockholms Enskilda Bank,* 293 U.S. at 87.

Thus, to determine the meaning of section 48(a)(2)(B)(v), in addition to the words themselves, we must consider the context, the purposes of the law, and the circumstances under which the words were employed. See *Shell Oil Co. v. Iowa Dept. of Revenue,* 488 U.S. 19 (1988); *Puerto Rico v. Shell Co.,* 302 U.S. 253, 258 (1937); *Helvering v. Stockholms Enskilda Bank, supra* at 87, 89, 93–94. Furthermore, we must view the statute in context as a whole and with a view to its place in the overall statutory scheme. *King v. St. Vincent's Hosp.,* 502 U.S. 215, 221 (1991); *Stanford v. Commissioner,* 297 F.2d 298, 308 (9th Cir. 1961). Consequently, the various subsections of section 48 must be construed, if possible, as consistent and interrelated parts of a single statutory scheme. See *Davis v. Michigan Dept. of Treasury,* 489 U.S. 803, 809 (1989); *United States v. California Portland Cement Co.,* 413 F.2d 161, 164 (9th Cir. 1969).

The ITC provisions initially were added to the Code by the Revenue Act of 1962, Pub. L. 87–834, sec. 2, 76 Stat. 960, 962. Congress intended the investment credit as a stimulus to encourage capital investment by reducing the net cost of acquiring some assets. See *Zuanich v. Commissioner,* 77 T.C.

428, 461 (1981) (Goffe, J., concurring in part and dissenting in part). Regarding the anticipated economic effect of the investment tax credit, the report of the Senate Finance Committee states the following:

The objective of the investment credit is to encourage modernization and expansion of the Nation's productive facilities and thereby improve the economic potential of the country, with a resultant increase in job opportunities and betterment of our competitive position in the world economy. The objective of the credit is to reduce the net cost of acquiring new equipment; this will have the effect of increasing the earnings of new facilities over their productive lives and increasing the profitability of productive investment. It is your committee's intent that the financial assistance represented by the credit should itself be used for new investment, thereby further advancing the economy. Only in this way will the investment credit fully serve the overall national interest in greater productivity, a healthy and sustained economic growth, and a better balance in international payments. [S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 707, 717–718].

The reports of both the House Ways and Means Committee, H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 411, 412, and the conference committee, H. Conf. Rept. 2508, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 1129, 1142, on the Revenue Act of 1962 are consistent with the above-quoted language.

Not all property qualified for the investment credit. Congress defined generally the property eligible for the investment credit in paragraph 1 of section 48(a), but in other paragraphs of that section specifically excluded particular categories of property from the benefits of ITC, for example, property used for lodging, sec. 48(a)(3), property used by certain tax-exempt organizations, sec. 48(a)(4), property used by governmental units, sec. 48(a)(5), as well as property used predominantly outside of the United States, sec. 48(a)(2)(A). The committee reports provided only a minimal explanation of Congress' intent relating to the exclusion from section 38 property of property used predominantly outside the United States and the limited exceptions to that exclusion. In that regard, H. Rept. 1447, *supra,* 1962–3 C.B. at 416, and S. Rept. 1881, *supra,* 1962–3 C.B. at 723, state as follows:

(4) Property used predominantly outside of the United States. However, there are certain exceptions where this type of property is eligible for the credit, namely, in the case of domestically owned aircraft, rolling stock of

railroads, vessels and motor vehicles, where the use is partially within and partially without the United States. Similarly, an exception is made for domestically owned containers which are used in the transportation of property to or from the United States. A further exception is made for domestically owned property used in exploring for, developing, removing, or transporting natural resources from the outer Continental Shelf of the United States. Property used predominantly outside of the United States (with the exceptions noted) is omitted, since the primary purpose of the credit is to encourage investment within the United States.

H. Rept. 1447, *supra,* 1962–3 C.B. at 517, and S. Rept. 1881, *supra,* 1962–3 C.B. at 860, describe property used predominantly outside of the United States as follows:

The term "predominantly outside the United States" means that the property must be physically located outside the United States more than 50 percent of the time during any one taxable year. Thus, if property is originally placed in service in the United States and a credit is received on such property, but such property is thereafter in any one year used predominantly outside the United States, such property ceases to be section 38 property with respect to the taxpayer who obtained the credit, regardless of the fact that the property is later returned to the United States. Furthermore, if property is originally placed in service by the taxpayer outside the United States and is used predominantly outside the United States during the taxable year originally placed in service, such property cannot qualify as section 38 property with respect to such taxpayer.

Thus, it appears that Congress believed that property described in section 48(a)(2)(B) could stimulate the U.S. economy even though used outside of the United States more than 50 percent of the time during the taxable year if the property was employed in the prescribed manner. Congress consequently extended ITC for "aircraft, rolling stock of railroads, vessels and motor vehicles, where the use is partially within and partially without the United States", "containers which are used in the transportation of property to or from the United States", and "property used in exploring for, developing, removing, or transporting natural resources from the outer Continental Shelf of the United States" even though used predominantly outside of the United States because that property "[encouraged] investment within the United States."

Petitioners accede to an actual use requirement for aircraft, vessels, and motor vehicles, on the basis that the applicable subparagraph of section 48(a)(2)(B) utilizes the

word "operated" rather than the word "used" in specifying the particular requirements for compliance with the specific exception. See sec. 48(a)(2)(B)(i), (iii), (iv). Petitioners assert that it is more logical and practical to apply an actual use test to aircraft, vessels, and motor vehicles, because those types of equipment typically move more rapidly and frequently than containers. Petitioners thus contend in essence that in the applicable exceptions for aircraft, vessels, and motor vehicles Congress deliberately utilized the term "operated" instead of the term "used" to distinguish usage requirements for containers from usage requirements for aircraft, vessels, and motor vehicles.

Respondent counters that petitioners have cited no reason expressed by Congress in 1962 for requiring some types of property under section 48(a)(2)(B) to be actually used but not other types of property. Respondent contends that Congress used different words because the types of property are different, not because the inquiry is different. According to respondent, each of the exceptions looks to actual use of the applicable property because use measures the benefit to investment in the United States. Respondent posits that for purposes of section 48(a)(2)(B) the words "used" and "operated" do not have different meanings. We agree with respondent.

In our view, Congress merely tailored the language of the exceptions enumerated in section 48(a)(2)(B) to fit the type of equipment being addressed. For purposes of section 48(a)(2)(B), we see no meaningful difference between the word "used" and the word "operated". As we understand the applicable legislative history, with the ITC provisions Congress intended to foster U.S. economic growth by encouraging investment in property that would be used principally in the United States. Congress, however, believed that certain specified equipment nonetheless could contribute to the U.S. economy even though used predominantly outside of United States. In section 48(a)(2)(B) Congress attempted to define the minimum contact with the United States that equipment must have to qualify as section 38 property. See *McCarty v. Commissioner,* T.C. Memo. 1987–254 (interpreting the vessel exception under section 48(a)(2)(B)(iii)). The committee reports succinctly state that "any container of a United States person *which is used* in the transportation of property

to and from the United States may be section 38 property even though used predominantly outside the United States." H. Rept. 1447, *supra,* 1962–3 C.B. at 518; S. Rept. 1881, *supra,* 1962–3 C.B. at 860 (emphasis added). An actual usage requirement for section 48(a)(2)(B)(v), rather than a potential usage requirement, is more in harmony with the surrounding words and the history and purpose of section 48(a)(2) taken as a whole. Nothing in the legislative history suggests that Congress intended containers to be eligible section 38 property even though they never transported property to or from the United States. To allow ITC for a container that never actually transported property to or from the United States would be inconsistent with Congress' intent to encourage investment within the United States. See H. Rept. 1447, *supra,* 1962–3 C.B. at 416–418; S. Rept. 1881, *supra,* 1962–3 C.B. at 722–723. We conclude, therefore, that under section 48(a)(2)(B) some minimum contact with the United States is required for a container to qualify as section 38 property.

In light of our conclusion that some minimum contact with the United States is required under the container exception, we need not address respondent's argument that our holdings in *McCarty v. Commissioner, supra, Kelley v. Commissioner,* T.C. Memo. 1982–728, and *Texas Instruments, Inc. v. Commissioner,* 98 T.C. 628 (1992), support an actual use requirement for the container exception. We have considered other arguments raised by petitioners in support of their position that mere availability for use is sufficient under the container exception but find them to be unpersuasive.

Our task is not completed, however, because we still must determine how much contact is required under the container exception and whether any of the containers satisfied that requirement. We first consider the degree of contact with the United States that is required under section 48(a)(2)(B)(v) for a container to meet the container exception.

In Rev. Rul. 90–9, 1990–1 C.B. 46, 47, the Commissioner concluded that section 48(a)(2)(B)(v) and section 1.48–1(g)(2)(v), Income Tax Regs., require a container to be "used substantially in the direct transportation of property to or from the United States during each taxable year of its recovery period" to meet the container exception.

Revenue rulings may be helpful in interpreting a statute based on their intrinsic value; however, they do not have the

force of law and are merely statements of the Commissioner's litigating and administrative position. *Stubbs, Overbeck & Associates v. United States,* 445 F.2d 1142, 1146–1147 (5th Cir. 1971); *Burton v. Commissioner,* 99 T.C. 622, 629 (1992); see also *Dixon v. United States,* 381 U.S. 68, 73 (1965); *Frontier Sav. Association v. Commissioner,* 87 T.C. 665, 678 (1986), affd. 854 F.2d 1001 (7th Cir. 1988); *Stark v. Commissioner,* 86 T.C. 243, 250–251 (1986). A ruling or other interpretation by the Commissioner is only as persuasive as her reasoning and the precedents upon which she relies. *Halliburton Co. v. Commissioner,* 100 T.C 216, 232 (1993), affd. without published opinion 25 F.3d 1043 (5th Cir. 1994).

At trial, respondent could not quantify the amount of contact that would suffice for a container to satisfy her interpretation of the container exception.

It is the statute that governs, and we thus look to the statute, its context, and its purposes to determine how often the containers needed to transport property to or from the United States during 1981 to meet the container exception. See *Commissioner v. Engle,* 464 U.S. at 223.

It appears that Congress did not explicitly consider the extent of contact with the United States a container must have to satisfy the container exception. In our view, however, general ITC principles would require that a container be used for the prescribed purpose at least once during the year it is placed in service and each year during the recapture period.

The determination of entitlement to the investment credit must be made under the conditions that exist in the year the property is first placed in service. *Bloomberg v. Commissioner,* 74 T.C. 1368, 1372 (1980); *World Airways, Inc. v. Commissioner,* 62 T.C. at 809; see also secs. 1.46–3(d)(4)(i), 1.48–1(a), Income Tax Regs. Consequently, property that does not satisfy the pertinent statutory requirements for section 38 property in its first year will not qualify for ITC in a subsequent year should that property later otherwise meet those requirements. See also secs. 1.46–3(d)(4)(i), 1.48–1(a), Income Tax Regs.[31] A container used predominantly outside

---

[31] These are legislative regulations which can be set aside only if they are arbitrary, capricious, or clearly contrary to the statute. See sec. 38(b); *Ranier v. United States,* 871 F.2d 607, 610 (6th Cir. 1989); *Anderson v. Commissioner,* 446 F.2d 672, 674 (5th Cir. 1971), affg. 54 T.C. 1035 (1970); *Moradian v. Commissioner,* 53 T.C. 207, 210 (1969); see also *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 24 (1982) (citing *Rowan Cos. v. United States,* 452 U.S. 247, 253 (1981)); *Batterton v. Francis,* 432 U.S. 416, 425 n.9 (1977); *McKnight v. Commissioner,* 99 T.C.

the United States qualifies as section 38 property only if it is used to transport property to or from the United States. Sec. 48(a)(2)(B)(v). It follows that, if the container does not transport property to or from the United States at least once in the taxable year that container is first placed in service, it does not meet the statutory requirements under section 48(a)(2)(B)(v) for that year and hence, under section 1.48–1(a), Income Tax Regs., can never qualify as eligible section 38 property. See also sec. 1.48–1(g)(1)(ii), Income Tax Regs.[32]

In addition, section 47 provides that ITC shall be recaptured when section 38 property "is disposed of, or otherwise ceases to be section 38 property" in the taxpayer's hands before the close of the useful life taken into account initially in calculating the ITC. *Goldstone v. Commissioner*, 65 T.C. 113 (1975); see also sec. 1.47–1(a), Income Tax Regs. Property ceases to be section 38 property if, among other things, a change occurs in the use of the property, for example, if in a year subsequent to the credit year the section 38 property is used predominantly outside the United States. *Williams v. Commissioner*, T.C. Memo. 1987–308; H. Rept. 1447, *supra,* 1962–3 C.B. at 418; S. Rept. 1881, *supra,* 1962–3 C.B. at 724; see secs. 1.47–2(a)(2), 1.48–1(g)(1)(ii), Income Tax Regs. It follows that if a container does not transport property to or from the United States at least once in each taxable year after the year it was placed in service, the container ceases to be section 38 property because of the change in its use. See secs. 1.47–2(a)(2), 1.48–1(g)(1)(ii), Income Tax Regs.

We find no support in the record, however, for a holding that a container must be used more than once each year in the transportation of property to or from the United States to satisfy section 48(a)(2)(B)(v). Consequently, we conclude

---

180, 183 (1992), affd. 7 F.3d 447 (5th Cir. 1993).

[32] Sec. 1.48–1(g)(1)(ii), Income Tax Regs., provides as follows:

(ii) Since the determination of whether a credit is allowable to the taxpayer with respect to any property may be made only with respect to the taxable year in which the property is placed in service by the taxpayer, property used predominantly outside the United States during the taxable year in which it is placed in service cannot qualify as section 38 property with respect to such taxpayer, regardless of the fact that the property is permanently returned to the United States in a later year. Furthermore, if property is used predominantly in the United States in the year in which it is placed in service by the taxpayer, and a credit under section 38 is allowed with respect to such property, but such property is thereafter in any one year used predominantly outside the United States, such property ceases to be section 38 property with respect to the taxpayer and is subject to the application of section 47.

that one contact with the United States in 1981 is sufficient for a container to satisfy the container exception.

However, petitioners contend in essence, among other things, that requiring a container lessor to prove that a container was used in the prescribed manner each year is inconsistent with the realities of the container industry and would require a degree of computer tracking technology that generally was not in place in the early eighties and at a cost adverse to the needs of the industry. However, as we have said in another case involving ITC: "The Congress may have thought highly of the investment credit, but it hedged the provisions about with great numbers of restrictions. It is not for us * * * to question the wisdom of the restrictions on the investment credit." *Zuanich v. Commissioner,* 77 T.C. at 451–452 (fn. ref. omitted).

We now must decide whether any of the containers satisfied the container exception so as to qualify for ITC for 1981 and accelerated depreciation for 1981 through 1985. Petitioners implicitly contend that, if actual use is required under the container exception, then most of the containers nonetheless satisfied that exception. Respondent disagrees. The parties have submitted expert testimony in support of their respective positions. We have found that testimony, for the most part, of little benefit to the Court. The experts, especially respondent's, in our view appear to have based their conclusions on assumptions which seem tailored to arrive at a predetermined end.

We weigh expert testimony in light of the expert's qualifications as well as all the other credible evidence in the record. *Estate of Newhouse v. Commissioner,* 94 T.C. 193, 217 (1990). We are not bound by the opinion of any expert witness, and we will accept or reject that expert testimony when, based on the record, in our best judgment it is appropriate to do so. *Id.*; *Chiu v. Commissioner,* 84 T.C. 722, 734 (1985). While we may choose to accept the opinion of one expert in its entirety, *Buffalo Tool & Die Manufacturing Co. v. Commissioner,* 74 T.C. 441, 452 (1980), we also may be selective in the use of any portion of that opinion, *Parker v. Commissioner,* 86 T.C. 547, 562 (1986).

In the instant cases, we give no weight to the expert opinions expressed by respondent's expert witnesses, Darwin Epps (Epps) and Oddvar Karlsen (Karlsen). For the most

part, we find their analyses of container movement to be based on inadequate samplings and their reports to be riddled with faulty or slanted assumptions as well as inaccurate and incomplete data. Consequently, we reject their conclusions as unreliable.

However, we do not embrace wholeheartedly the conclusions espoused by petitioners' expert witnesses because, in our view, some of the assumptions on which they relied also appear faulty. Below, in our analysis of those conclusions, we will focus primarily on the testimony given, and the conclusions reached, by Eugene P. Ericksen (Ericksen) because he relied to some extent on the conclusions of petitioners' other expert witnesses, Michael L. Cohen (Cohen) and Colin C. Munro (Munro), to reach his own conclusions.

Ericksen determined the probability that the containers came to or left from the United States (touched) using alternative time periods, including yearly tests, under which a container had to touch the United States once each year of the applicable period (e.g., 1981, 1981–82, 1981–83), and periodic tests, under which a container had to touch the United States once in each period. For purposes of his report, Ericksen was asked by Flexi-Van to determine the probability that the containers touched the United States at least once in the 3-year period commencing January 1, 1981, and ending December 31, 1983 (1981–83 period). For this purpose, he estimated the proportion of the value of the containers that came to the United States at least once during that period. Ericksen concluded that 89.7 percent of the container value of the 37,983 containers he studied,[33] weighed by cost, actually was used in the transportation of property to or from the United States during the 1981–83 period.

Ericksen based his conclusions on Flexi-Van's records showing the location at which the containers were picked up or dropped off at the beginning or end of each lease, the route structures of Flexi-Van's lessees as determined under Munro's direction by Dynamar BV (Dynamar), a maritime consultancy company,[34] and a statistical analysis using an

[33] For purposes of making his calculations for the 1981–83 period, Ericksen eliminated 54 of the 38,037 containers in issue because those containers had no lease activity by Dec. 31, 1983.

[34] Dynamar estimated the container carrying capacities, in terms of TEU's, of 105 of Flexi-Van's lessees to determine the portion of each lessee's container capacity that was available for use on U.S. routes and the portion available for use on non-U.S. routes during the period Jan.

estimate of the average number of trips an average container in world trade would make each year during 1981 and subsequent years. For the average number of trips each year Ericksen used 5.5, which was based on an analysis prepared under Cohen's direction by Mercer Management Consulting (Mercer), a global general management consulting firm,[35] as well as a study prepared by Raymond H. Fenyoe and Gerard M. Brannon (Fenyoe/Brannon study) that was submitted to the IRS National Office by Reliance Group in support of its request for technical advice, see *supra* p. 26. For 1981, the Fenyoe/Brannon study estimated that a container made an average of 5.3 trips a year (excluding transshipments).[36]

For purposes of his analysis, Ericksen assumed that a container was actually used substantially in the transportation of property to or from the United States if it made a single trip to or from the United States during the 1981–83 period. Ericksen first calculated the probability of each individual container's touching the United States at least once during the 1981–83 period. For this purpose, Ericksen divided the 37,983 containers into five groups.

Group 1 consisted of 18,521 containers (48.8 percent of the total) that were on-hired or off-hired in the United States in connection with a lease during the 1981–83 period. Ericksen assumed that all of the group 1 containers were engaged in

---

1, 1981, through June 30, 1986. Ninety of the 105 lessees studied were Flexi-Van's largest customers (measured in terms of container days) and represented 85 percent of Flexi-Van's business relating to the containers for that period. Ericksen statistically selected the other 15 lessees studied from the remaining 587 container lessees. Of the 105 lessees, 30 had no U.S. trade routes during 1981, while 24 had 100 percent of their container capacity devoted to U.S. trade routes during 1981. Dynamar concluded that during each year in the period 1981 through 1986, more than 50 percent of the container capacity of the lessees of the containers as a group was devoted to shipping cargo to and from the United States. Dynamar concluded further that during 1981 56.2 percent of the container capacity of the 105 lessees was devoted to shipping cargo to and from the United States. For purposes of its analysis, Dynamar first identified the routes on which each lessee was operating container services, and then it identified the ships that were employed on those services to estimate the capacity available to that service (calculated by multiplying the average capacity of the ships employed in each service by the number of sailings each year). Dynamar next divided the total estimated TEU's utilized in U.S. trade routes by the total estimated TEU's utilized in all trade routes of the lessee. For purposes of its study, Dynamar did not take into account the actual container capacity utilization by the lessee.

[35] Mercer concluded that during the years in issue a container made an average of five to six trips each year. For purposes of its analysis, Mercer estimated total loaded and empty container moves and divided that product by the estimated total world container fleet. Mercer did not estimate container trips for 1981. Mercer estimated that for 1982 a container made an average of 6.24 loaded and unloaded moves. Excluding unloaded moves, the average number of loaded moves for 1982 would be 4.47.

[36] A transshipment occurs when cargo is shipped to one location by one carrier and then is picked up and transported to another location by a second carrier.

the transportation of property to or from the United States during the 1981–83 period, and that the probability of those containers' coming to or going from the United States during that period was 100 percent.

Group 2 consisted of 4,884 containers (12.9 percent) that did not have an on-hire or off-hire in the United States during the 1981–83 period, but that were leased to a lessee all of whose container capacity was devoted to U.S. routes according to Dynamar's study. Ericksen treated all of those containers as having been engaged in the transportation of property to or from the United States during the 1981–83 period and also assigned them a probability of 100 percent.

In group 3 were 1,895 containers (5 percent) that were leased to shipping companies with no U.S. routes or exclusively on single trip leases between two non-U.S. ports. Those containers were deemed not to have been used in the transportation of property to or from the United States during the 1981–83 period and were assigned a zero probability of touching the United States.

In group 4 were 7,443 containers (19.6 percent) that were leased to one or more shipping companies with some U.S. routes and which had at least one multitrip lease to a lessee that Dynamar studied and no multitrip lease to a lessee not studied by Dynamar. For each such individual container, Ericksen estimated the probability that it had touched the United States during the 1981–83 period. To calculate that probability, Ericksen utilized (1) an assumption that the probability of that container's coming to or going from the United States on any one trip was equal to the proportion of the carrying capacity of the lessee estimated by Dynamar to have been devoted to U.S. routes, and (2) an assumption of the number of trips the container made during the lease period, estimated on the basis of information in Flexi-Van's database and the premise that a container on average made 5.5 trips each year.[37] Ericksen used the following formula to

---

[37] For this purpose, Ericksen calculated the number of trips a container made during the term of its lease based on the length of the lease as derived from Flexi-Van's database and using the assumptions that a trip lasted 66 days and that a container on average made 5.5 trips a year. For example, if the lease lasted 200 days, he assumed that the container made 3.01 trips, computed as follows:

$$200 \times 5.5/365 = 3.01$$

calculate the probability of a container in group 4 touching the United States while on lease:

$$1 - (1 - p)^n,$$

where p represents that portion of the lessee's capacity that goes to the U.S. and n represents the number of trips.

Group 5 consisted of 5,240 containers (13.8 percent) that were leased on a multitrip lease to at least one lessee not studied by Dynamar and that were not on-hired or off-hired in the United States. Ericksen did not have information about the route structures of the group 5 containers. Therefore, he could not estimate for each of those containers the probability of their touching the United States during the 1981–83 period. For those containers he applied information obtained from Dynamar's sampling of 15 statistically selected lessees to 415 containers leased by them to draw inferences from that sampling. Ericksen then applied those inferences to the containers in group 5 to place them in either group 2, 3, or 4.

After Ericksen calculated the probability of each container touching the United States, he averaged those probabilities to derive a single average probability for all the containers. For that purpose, Ericksen weighed each container in proportion to its cost. For the 415 containers selected to be sampled, Ericksen applied weights to account for the fact that they represented 5,655 containers (415 containers from group 4 plus all of the 5,240 containers from group 5). For those containers, the weight is equal to cost divided by the probability of selection.

According to Ericksen, failure to weigh by cost would result in either an overcalculation or undercalculation of ITC because the amount of ITC available for each container is a function of the cost of that container. Ericksen gives the following example: A lessee has two containers; the first costs $2,000 and has a 100 percent probability of touching the United States, and the second costs $4,000 and has a zero percent probability of touching the United States. The proportion of container value coming to or leaving from the United States for those two containers is 33⅓ percent ($2,000 divided by $6,000), not 50 percent (1 divided by 2).

The weighted average for the containers was 89.7 percent. As a check of the reasonableness of his assumptions, Ericksen recalculated the average probability of the containers' touching the United States during the 1981–83 period using different assumptions. Reducing the estimated number of trips to the United States per year to four lowered the average probability of the containers' touching the United States to 88.4 percent. Increasing the estimated number of trips to six raised the probability of the containers' touching the United States to 90.4 percent.

Respondent contends that Ericksen erred in assuming that the containers were fungible, the movements of the containers were independent, an on-hire or off-hire was an accurate proxy for the transportation of property in a container, one on-hire or off-hire in a 3-year period was substantial, and a weighting by cost is proper. Respondent argues that, as a result, petitioners have not proved substantial use of over 89 percent of the containers.

Respondent contends further that Dynamar did not trace the containers but only determined the container capacity of the vessels utilized by 105 of Flexi-Van's customers. Respondent asserts that capacity might be a reliable substitute for measuring actual use if all lessees sail vessels at full capacity, but they do not. Respondent also contends that Dynamar's conclusions as to the capacity devoted to U.S. trade by two of the shipping lines was incorrect, it made several errors in estimating capacity, and it made no attempt to reconcile differences in information furnished by Flexi-Van about its lessees from information contained in Containerisation International Yearbook about those lessees. Petitioners counter that Dynamar's percentages likely understate the actual amount of U.S. versus non-U.S. container traffic because the actual utilization of TEU capacities by vessels on U.S. trade routes was at least as high as, if not higher than, actual utilization on non-U.S. trade routes and the use of partially containerized multipurpose vessels was more prevalent on non-U.S. services. Petitioners assert that Dynamar's percentages would overstate the actual percentages of U.S. trade for Flexi-Van's lessees only if there were greater actual utilization of vessel capacities on non-U.S. routes than on U.S. routes. Petitioners contend that the evidence establishes that the opposite was true.

Respondent, however, contends that the record in the instant cases does not support petitioners' position because it does not definitively establish which containers actually touched the United States during the years in issue. Respondent emphasizes that the containers were put in worldwide commerce without regard to the lessees' operations or routes; about 85 percent of the containers were first leased overseas, primarily in Asia; many of the significant lessees operated routes that had no U.S. ports; some of the biggest lessees operated in non-U.S. routes only in some or all of the years in issue while other significant lessees, including U.S.-based shipping lines, operated almost all of their traffic in U.S.-based routes; many significant lessees operated worldwide services; and the average capacity of the lessees of the containers in U.S. trade for 1981 was only 56.2 percent according to Dynamar.

We agree in part with respondent's criticism of Ericksen's conclusions. As we have discussed above, in our view, under the container exception a container must transport property to or from the United States at least once each year during the recapture period to satisfy that exception. Ericksen's report, however, focuses on the 1981–83 period.

As stated above, Ericksen calculated probabilities of the containers' touching the United States using alternative time periods. In his report Ericksen summarily states that 71.8 percent of the containers probably touched the United States at least once during 1981. Ericksen, however, did not quantify the number of containers allocated to each of groups 1 through 5 for 1981 or otherwise explain how he arrived at that percentage. Consequently, we are unable to test the reasonableness of the 71.8 percent. The number appears high, however, in light of Dynamar's estimate that for 1981 56.2 percent of the container capacity of 105 of Flexi-Van's lessees was devoted to U.S. trade routes and that for 1981 Containerisation International reported that U.S. container port handlings represented 20.5 percent of total world container port handlings (8.36 million TEU's divided by 40.85 million TEU's). See *supra* p. 18.

In addition, we are not convinced that available container capacity is a reliable measure of utilized capacity. At trial, Munro acknowledged that there are certain difficulties in using container capacity to predict utilization; for example,

because of the nature of the route, a vessel may not use containers even though it is equipped to carry them. Furthermore, we are not convinced that the number of TEU's a vessel is capable of carrying correlates to the number of containers that the vessel actually may carry. Moreover, we believe that empty container moves should have been eliminated from the calculation of average container moves because no property is transported to or from the United States when the container is empty.

However, we agree basically with Ericksen that containers, at least of the same type and size, were fungible. We also agree that the movements of the containers were independent of each other.

We are persuaded from the record that petitioners should be allowed ITC for those containers with a 1981 on-hire or off-hire in the United States because those containers obviously touched the United States at least once during that year and there was a fairly high probability that those containers were loaded. Furthermore, we are persuaded that ITC should be allowed for containers leased to lessees with 100 percent of their container capacity devoted to U.S. trade routes during 1981, since there is more than a likely probability that those containers transported property to or from the United States at least once during the year. Moreover, we are convinced that ITC should be allowed for a reasonable number of containers leased to lessees who had at least part of their container capacity devoted to U.S. trade routes, because it is reasonable to assume that some of those containers touched the United States at least once during 1981. We must decide therefore what is a reasonable percentage for those containers.

Respondent seemingly agrees in part with our conclusions since, on brief, she conceded that, on the basis of the identity of the lessee, the period of the lease, and the place where a container was recorded as on-hired or off-hired, 9,452 of the containers [38] probably were used substantially in the transportation of property to or from the United States during 1981. Respondent asserts that 7,442 of the remaining containers were leased for terms exceeding 1 year in each of

---

[38] Respondent excludes from her concession 919 containers that were first on-hired during 1980.

the years from 1981 through 1985 to lessees that had no U.S. trade routes. Respondent argues that, absent direct proof to the contrary, it may be assumed that those 7,442 containers were not substantially used in the direct transportation of property to or from the United States during 1981, and therefore petitioners have not shown that those containers met the container exception. Respondent asserts further that the record establishes that another 4,500 of the remaining containers were placed in service before January 1, 1981. Respondent argues that those 4,500 containers are not eligible for the safe harbor lease provisions.[39] As for the remaining 16,643 containers, respondent contends that petitioners have not shown that they were used each year during the recapture period in the direct transportation of property to or from the United States. Therefore, respondent asserts, petitioners have failed to carry their burden of proving that 28,585 of the containers were eligible section 38 property for 1981 or that any of the containers were eligible section 38 property for 1982 through 1985. She argues that ITC and accelerated depreciation for 1981 must be limited to 9,452 containers.[40]

Respondent has given no detailed explanation as to how she calculated the 9,452 containers she is willing to concede are eligible for ITC for 1981. To the extent that she relied on the conclusions of Epps and Karlsen, we reject respondent's position as unreliable. Based on the record, we do not agree with respondent that ITC and accelerated depreciation for 1981 must be limited to 9,452 containers.

In the instant cases, respondent's position would result in about 25 percent of the containers qualifying for ITC and accelerated depreciation. Rev. Proc. 90–10, 1990–1 C.B. 467,

---

[39] Of those 4,500 containers, the parties stipulated that a 1993 computer database prepared by Flexi-Van in preparation for the trial reflect EIR activity before Jan. 1, 1981, for 4,000 containers. See *supra* note 10. Respondent alleges that an EIR reflects that an additional 500 containers were leased to Hapag Lloyd in October 1980. At trial, we granted petitioners' motion in limine filed Sept. 20, 1993, in which petitioners asked the Court to preclude respondent from, among other things, presenting any issue relating to the date on which the containers were placed in service because its introduction at such a late date would unfairly prejudice petitioners because they did not have sufficient opportunity to prepare that issue for trial. In her brief, respondent requested that we reconsider our ruling and find on the basis of the record that those 4,500 containers are not eligible for ITC for 1981 because they were placed in service before the beginning of that year. For the reasons previously articulated at trial, we decline to change our ruling.

[40] Respondent, however, does not concede that any containers satisfied the container exception for the later years in issue.

which was issued on the same day as Rev. Rul. 90–9, 1990–1 C.B. 46, sets out a relief mechanism by which a taxpayer may use a table provided in the revenue procedure to calculate the percentage of the bases of all containers placed in service during a taxable year that are eligible for ITC, or subject to recapture if the taxpayer lacks the records required in Rev. Rul. 90–9, *supra,* to document that a cargo container is eligible for ITC or accelerated depreciation under the container exception. The percentage for 1981 and subsequent years is 50 percent. Rev. Proc. 90–10, 1990–1 C.B. at 468. The percentages set forth in the table purportedly reflect industry-wide usage of cargo containers. *Id.* Petitioners, however, have not elected the relief provided by Rev. Proc. 90–10, *supra.*

Neither petitioners nor Flexi-Van maintained records for the years in issue sufficient to trace all movements of the containers during that period. Consequently, they cannot establish with exactitude that each container did in fact satisfy the container exception for 1981 and subsequent years. Nonetheless, we are convinced that many of the containers were used in the transportation of property to or from the United States during the years in issue. Accordingly, using our best judgment, on the basis of the record as a whole, we find that for 1981 no ITC is allowed for the 54 containers Ericksen eliminated from his calculations because there was no lease activity for those containers by December 31, 1983. In addition, no ITC is allowed for containers that were leased to lessees having no U.S. trade routes or exclusively on single-trip leases between two non-U.S. ports. However, ITC is allowed for those containers with a 1981 on-hire or off-hire in the United States and for those containers leased to lessees with 100 percent of their container capacity devoted to U.S. trade routes during 1981. In addition, ITC is allowed for 33⅓ percent of the cost of any remaining containers.

As for 1982 through 1985, we agree technically with respondent that ITC should have been recaptured for those containers that did not transport property to or from the United States at least once each of those years. Nonetheless, as we ruled at trial, respondent raised that issue too late. Consequently, in line with our ruling at trial, for the subse-

quent years of the recapture period, the containers for which ITC is allowed are subject to the recapture provisions of section 47 but only to the extent of the amount of recapture originally included in the corporate Federal income tax returns for those years.

Although our holding above resolves the ultimate issue raised in these cases, our task is not yet complete because we believe that fairness dictates we address why we do not agree with petitioners that it is inequitable to require them to satisfy the container exception for the years in issue. In essence, petitioners argue that it is unfair to apply the container exception to them for the years in issue, because respondent treated direct competitors of Flexi-Van more favorably with respect to containers placed in service in 1981 and because, without any advance warning, respondent changed her position on the container exception in a manner detrimental to petitioners.

First, petitioners assert that respondent acted capriciously, arbitrarily, and unreasonably when she applied Rev. Rul. 90–9, *supra,* to containers Flexi-Van placed in service during 1981 but she did not apply it to containers Flexi-Van's competitors placed in service during the same year. Petitioners essentially contend that respondent violated a duty of consistency owed to Flexi-Van.

However, there is no evidence that, after the issuance of Rev. Rul. 90–9, *supra,* respondent irrationally applied the ruling to some taxpayers but not to others. For example, Tech. Adv. Mem. 90–45–001 (May 3, 1990), which was issued in connection with the audit of Reliance Group, see *supra* p. 26, is consistent with respondent's disallowance of petitioners' claimed deductions and credits.

Petitioners contend nevertheless that respondent agreed not to apply Rev. Rul. 90–9, *supra,* to containers Transamerica placed in service before 1983. Such circumstance does not lead to a finding of impermissible disparate treatment, however. The record shows that the agreement with Transamerica was part of a settlement offer. Respondent is not required to offer the same settlement proposal to petitioners as she offered to another taxpayer. *Avers v. Commissioner,* T.C. Memo. 1988–176; *Bunce v. United States,* 28 Fed. Cl. 500 (1993), affd. without published opinion 26 F.3d 138 (Fed. Cir. 1994). In the instant cases there is no

proof that petitioners were singled out for special treatment based on impermissible considerations. See *Penn-Field Indus., Inc. v. Commissioner,* 74 T.C. 720, 721–722 (1980); *Wooten v. Commissioner,* T.C. Memo. 1993–241; see also *Jaggard v. Commissioner,* 76 T.C. 222, 225–228 (1981); *Davis v. Commissioner,* 65 T.C. 1014, 1022–1023 (1976), and the cases cited therein. Therefore, we are not convinced that under the duty of consistency theory, petitioners should be allowed ITC for the containers without establishing that those containers met the container exception for 1981.

Additionally, petitioners assert essentially that it is unfair to apply the container exception to them for the years in issue because respondent's current position on the meaning of the container exception differs from her prior interpretation of that exception. Petitioners contend in essence that Flexi-Van believed respondent was interpreting the container exception in the same manner as Flexi-Van because, in prior audits of Flexi-Van's corporate Federal income tax returns, respondent's agents proposed no adjustments to the ITC which Flexi-Van had claimed for containers on those returns. Petitioners assert that respondent owed Flexi-Van a duty of consistency in her interpretation of section 48(a)(2)(B)(v) at least until she notified Flexi-Van that a new rule would be applied in future years.

Respondent counters in essence that, if anything, some of her agents may have made a good faith error in interpreting the container exception. Respondent, furthermore, questions whether either petitioners or Flexi-Van were misled by those prior audits of Flexi-Van. According to respondent, her agents did not raise the container exception issue with Flexi-Van before the examination of petitioners' corporate Federal tax return for the 1981 year. Under those circumstances, respondent asserts, a reasonable taxpayer would not have been misled into believing that respondent had found that Flexi-Van had satisfied the container exception.

Petitioners' position is in the nature of an argument for equitable estoppel. "Equitable estoppel is a judicial doctrine that 'precludes a party from denying his acts or representations which induced another to act to his detriment.'" *Hofstetter v. Commissioner,* 98 T.C. 695, 700 (1992) (quoting *Graff v. Commissioner,* 74 T.C. 743, 761 (1980), affd. 673 F.2d 784 (5th Cir. 1982)). It is well settled, however, that the

Commissioner cannot be estopped from correcting a mistake of law, even where a taxpayer may have relied to his detriment on that mistake. *Dixon v. United States,* 381 U.S. at 72–73; *Automobile Club of Mich. v. Commissioner,* 353 U.S. 180, 183–184 (1957); see also *Massaglia v. Commissioner,* 286 F.2d 258 (10th Cir. 1961), affg. 33 T.C. 379 (1959); *Zuanich v. Commissioner,* 77 T.C. at 432–433. An exception exists only in the rare case where a taxpayer can prove he or she would suffer an unconscionable injury because of that reliance. *Manocchio v. Commissioner,* 78 T.C. 989, 1001 (1982), affd. 710 F.2d 1400 (9th Cir. 1983). Moreover, "the doctrine of equitable estoppel is applied against the Government 'with the utmost caution and restraint.'" *Kronish v. Commissioner,* 90 T.C. 684, 695 (1988) (quoting *Boulez v. Commissioner,* 76 T.C. 209, 214–215 (1981), affd. 810 F.2d 209 (D.C. Cir. 1987)). The following conditions must be satisfied before equitable estoppel will be applied against the Government: (1) A false representation or wrongful, misleading silence by the party against whom the opposing party seeks to invoke the doctrine; (2) an error in a statement of fact and not in an opinion or statement of law; (3) ignorance of the true facts; (4) reasonable reliance on the acts or statements of the one against whom estoppel is claimed; and (5) adverse effects of the acts or statement of the one against whom estoppel is claimed. See *Kronish v. Commissioner, supra* at 695, and cases cited therein; *Foam Recycling Associates v. Commissioner,* T.C. Memo. 1992–645. Thus, estoppel requires a finding that a claimant relied on the Government's representations and suffered a detriment because of that reliance. *Schuster v. Commissioner,* 312 F.2d 311 (9th Cir. 1962), affg. 32 T.C. 998 (1959), affg. in part and revg. in part *First Western Bank & Trust Co. v. Commissioner,* 32 T.C. 1017 (1959); *Boulez v. Commissioner, supra; Estate of Emerson v. Commissioner,* 67 T.C. 612, 617–618 (1977); *Underwood v. Commissioner,* 63 T.C. 468 (1975), affd. 535 F.2d 309 (5th Cir. 1976).

The evidence in the instant cases does not support such a finding. There is no evidence that any of respondent's agents made false representations to Flexi-Van, or that respondent's agents knew that Flexi-Van's treatment of the ITC claimed for containers was incorrect. Even if we assume that those agents informed Flexi-Van that its treatment of ITC for

containers was correct, those statements would be erroneous representations of law, not of fact. Respondent ordinarily will not be estopped from correcting retroactively a mistake of law. *Automobile Club of Mich. v. Commissioner, supra*; *Manocchio v. Commissioner, supra;* see also *Burlington N.R.R. v. Commissioner,* 82 T.C. 143 (1984); *Rose v. Commissioner,* 55 T.C. 28 (1970); *Meneguzzo v. Commissioner,* 43 T.C. 824 (1965); see *Rollert Residuary Trust v. Commissioner,* 80 T.C. 619 (1983), affd. 752 F.2d 1128 (6th Cir. 1985); *Klein v. Commissioner,* T.C. Memo. 1989–283. Furthermore, petitioners have not shown that an unconscionable injury resulted from their reliance on misrepresentations made by respondent's agents. Petitioners' predicament is the result of failing to comply with the law. See *Garland v. Commissioner,* T.C. Memo. 1993–190. Consequently, we do not conclude that it is unfair to require petitioners to establish that the containers transported property to or from the United States at least once during 1981.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*